UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 02-232(DSD/SRN)

Jamin Neppl,

Plaintiff,

v.

**ORDER**

Signature Flight Support Corporation,

Defendant.

Michael L. Lander, Esq. and Lander Law Office, 301 Fourth Avenue South, Suite 270, Minneapolis, MN 55415 and Mark A. Greenman, Esq., Ruth Y. Ostrom, Esq. and Greenman & Ostrom, 301 Fourth Avenue South, Suite 270, Minneapolis, MN 55415, counsel for plaintiff.

Daniel C. Gerhan, Esq., Holly M. Robbins, Esq., and Faegre & Benson, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 and Richard S. Meyer, Esq. and Blank, Rome, Comisky & McCauley, One Logan Square, Philadelphia, PA 19103-6998, counsel for defendant.

This matter is before the court upon defendant's motion for partial judgment on the pleadings and upon plaintiff's mction for partial summary judgment. For the reasons stated, defendant's motion is granted in part and denied in part and plaintiff's motion is denied.

FILED 12-11-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ____________
Deputy Clerk's Initials ______

## BACKGROUND

Defendant provides ground services at the Minneapolis/St. Paul International Airport. Plaintiff was employed by defendant as a "ramp lead." His principal duties included plane de-icing and baggage handling. Plaintiff was a member of a collective bargaining unit and was represented by the International Association of Machinists ("IAM"). On January 15, 2001, plaintiff became ill and was hospitalized. He underwent gall bladder surgery the following day. Plaintiff contacted defendant to report his hospitalization and informed defendant that he would not be able to work for some period of time. He was told to bring a doctor's note to his employer after being released from the hospital.

Plaintiff was released from the hospital on January 18, 2001. He was instructed by his doctors to see his primary physician in two to three weeks. Plaintiff made an appointment to see his doctor on February 7, 2001. The doctors at the hospital also provided plaintiff with one or two documents indicating that he would be unable to work for two to three weeks. Plaintiff claims he took that paperwork to defendant's offices and showed it to a supervisor.[1] He was instructed to

[1] It is not clear from the record whether plaintiff provided one or two doctor's notes, or to whom they were shown.

return the following Monday, January 22, 2001 to meet with Robert Pflipsen ("Pflipsen"), a representative of defendant's human resources department.

Plaintiff and Pflipsen met on January 22, 2001. During that meeting, Pflipsen provided plaintiff with a document entitled "Employer Response to Employee Request for Family or Medical Leave." The form indicated that plaintiff was eligible for leave under the Family Medical Leave Act ("FMLA") from January 15, 2001 until February 7, 2001, provided he furnished a medical certification of a serious health condition by January 30th, and a fitness-for-duty certification before resuming his duties. Pflipsen gave plaintiff a form entitled "Certification of Healthcare Provider" to be completed by plaintiff's physician. Plaintiff informed Pflipsen of his February 7th follow-up appointment.

One of plaintiff's supervisors contacted him on February 3, 2001 and asked plaintiff to come in and work. Plaintiff reminded the supervisor that he was still on medical leave. When the supervisor persisted, plaintiff agreed to work that afternoon and evening, despite still believing himself to be on medical leave. Because defendant was short of staff, plaintiff ultimately worked three consecutive shifts, de-icing planes for approximately twenty-five hours. Before leaving work on

February 4th, plaintiff was asked to work again the following day, February 5th. Plaintiff claims he merely agreed to consider working the following day. [Neppl Aff. at ¶ 9.] Defendant alleges that plaintiff agreed to work on Friday, February 5th but neither came to work nor called in to report his absence. Plaintiff did not go to work on February 5th, but reported on February 7th as originally discussed with Pflipsen. Plaintiff did not have the certification of healthcare provider with him on February 7th. When plaintiff informed his supervisor that he did not have the certification, he was told he could not go back to work without a doctor's note. Plaintiff claims he had been unable to attend his February 7th doctor appointment due to a snow storm. Plaintiff initially claimed that after seeing his doctor the following day he showed the certification to two of his supervisors, Mr. Johnson and Ms. Osberg. [Answer to Def's Interrogatories at #2.] He has become less clear about which of his supervisors actually saw or received the certification on February 8th. [Neppl Aff at ¶ 11; Neppl Supplemental Aff. at ¶ 2.] Defendant claims that plaintiff did not bring the required certification on February 8th. [Aff's of Pflipson, Johnson, Osberg and Ptacek.]

Upon arriving at work on February 8th, plaintiff was instructed to wait in the office and not to begin working.

After his union representative was summoned, plaintiff was given a notice of termination for an unexcused absence on February 5, 2001. The notice of termination stated that the termination was pursuant to the company's attendance policy for plaintiff's third no-call no-show in a twelve month period.[2]

Defendant has moved for a partial judgment on the pleadings, arguing that plaintiff's FMLA claims are exclusively subject to the grievance and arbitration clauses in the collective bargaining agreement between defendant and IAM. Defendant also asserts that plaintiff's claim of negligent infliction of emotional distress should be dismissed for failing to state a claim upon which relief may be granted.[3] Plaintiff has moved for partial summary judgment on Count I of his complaint, alleging defendant's violation of the FMLA. For the following reasons, defendant's motion is granted in part and denied in part and plaintiff's motion is denied.

---

[2] Defendant's attendance policy prescribes various sanctions, including termination, for various numbers of no-call no-shows during a rolling twelve month period. Plaintiff does not dispute that he had two previous no-call no-shows within the preceding twelve months.

[3] Because defendant has offered affidavits and other evidence in support of the motion, the court construes it as a motion for summary judgment under Fed. R. Civ. P. 56(c). See Hamm v. Rhone Poulanc Rorer Pharmaceutical Inc., 173 F.R.D. 566, 570 (D. Minn. 1997).

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if

a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**a. Defendant's Motion for Judgment on the Pleadings**

Defendant's motion raises the question of whether or not an employee subject to a collective bargaining agreement with a general arbitration clause has waived the right to bring statutory claims, in this case under the FMLA, against his employer in federal court.[4] The court finds on the facts presented here that plaintiff has not waived his right to bring his FMLA claim in the judicial forum.

While the Eighth Circuit Court of Appeals has not spoken to the issue in this specific context,[5] many other circuits have

---

[4] The Supreme Court has held that the right to a judicial forum is a statutory right rather than a substantive right. See Gilmer v. Interstate-Johnson Lane Corp., 500 U.S. 20, 26 (1991).

[5] The most recent Eighth Circuit decision, Varner v. National Super Markets, Inc., 94 F.3d 1209 (8th Cir. 1996), predates the Supreme Court decision upon which defendant bases his motion. See Wright v. Universal Maritime Services Corp., 525 U.S. 70 (1998). Further, Varner considered the arbitration question in an exhaustion of remedies context only. See Varner, 94 F.3d at 1213. In any case, the court held that the plaintiff was not required to arbitrate before bringing her Missouri Human Rights Act and Title VII claims in federal court and that even if she had pursued arbitration, she would not be precluded from bringing those claims subsequently in federal court. See id. (citing Alexander v. Gardener-Denver Co., 415 U.S. 36, 49
(continued...)

considered the competing interests raised by this question. See e.g., Pryner v. Tractor Supply Co., 109 F.3d 354, 360 (7th Cir. 1997) (considering the arbitrability of Title VII, ADA and ADEA claims pursuant to a CBA and contrasting the interest in allowing bargaining groups to establish comprehensive dispute resolution schemes with the interest, expressed by Congress, in statutory and judicial protection of certain "vulnerable groups").[6] The United States Supreme Court and Congress have made it clear that arbitration is not a disfavored mechanism for resolution of most disputes, particularly in the labor-management context. See the Labor Management Relations Act of 1947 ("LMRA") 29 U.S.C. § 185; the Federal Arbitration Act ("FAA") 9 U.S.C. §§ 2-4; Textile Workers Union v. Lincoln Mills, 353 U.S. 448 (1957); United Steelworkers of America v. American

---

[5](...continued)
(1974)).

[6] See also Plumley v. Southern Container, Inc., 303 F.3d 364 (1st Cir. 2002) (arbitration of FMLA claims); Rogers v. New York University, 220 F.3d 73 (2nd Cir. 2000) (arbitration of FMLA claims); Tran v. Tran, 54 F.3d 115 (2nd Cir. 1995) (arbitration of Fair Labor Standards Act ("FSLA") claims); Satrit v. Cone Mills Corp., 248 F.3d 306 (4th Cir. 2001) (arbitration of Title VII claims); Carson v. Giant Food, Inc., 175 F.3d 325 (4th Cir. 1999) (arbitration of Title VII, Americans with Disabilities Act ("ADA") and Age Discrimination in Employment Act ("ADEA") claims); Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875 (4th Cir. 1996) (Title VII and ADA claims); Bratten v. SSI Services, Inc., 185 F.3d 625 (6th Cir. 1999) (ADA claims); Albertson's, Inc. v. United Food and Commercial Workers Union, 157 F.3d 758 (9th Cir. 1998) (FSLA claims).

Mfg. Co., 363 U.S. 564 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960) (the Steelworkers trilogy); Alexander v. Gardener-Denver Co., 415 U.S. 36, 46 (1974). However, despite the general policy favoring arbitration, all but the Fourth Circuit Court of Appeals have held that union representatives cannot waive individual employees' statutory rights to a judicial forum. See Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 885 (4th Cir. 1996) (compelling arbitration of Title VII and ADA claims under an arbitration clause in a CBA).

After Lincoln Mills and the Steelworkers cases, it is indisputable that most collectively bargained arbitration agreements must be enforced. However, arbitration is a creature of contract and the arbitrator's authority stems entirely from its terms. See Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 744 (1981) (citing Gardener-Denver, 415 U.S. at 53). The arbitrator's authority is therefore generally limited to the interpretation and enforcement of the language of the contract itself. See id. Courts have been asked to compel arbitration of claims based on statutes that were outside the specific language of the contract. Two lines of cases have emerged.

In the first line of cases, beginning with Gardener-Denver, the Court determined that submission of an employment discrimination claim to binding arbitration pursuant to a CBA did not preclude subsequent litigation of the same claim in federal court. See Alexander v. Gardener-Denver Co., 415 U.S. 36, 59-60 (1974). The Court offered several bases for its conclusion. First, the Court reasoned that because its Title VII powers were plenary and the statute contained no provisions barring post-arbitration judicial actions, a prior arbitration would not divest the federal courts of jurisdiction. See id. at 44-45. Second, the Court found that Congress intended for Title VII to work in tandem with other remedies rather than be supplanted by them. See id. at 47-48. Third, the Court distinguished contract rights which are arbitrable from statutory rights which may be vindicated in the courts. See id. at 49-50. Fourth, the Court acknowledged that employees may waive some rights through the collective bargaining process, but only those it considered collective, such as the right to strike. See id. at 51. Fifth, because the arbitrator's authority stems from the contract, he or she "has no general authority to invoke public laws," and is required to give effect to the intent of the parties rather than enforce the statute. Id. at 53. Finally, the Court expressed its concern that

arbitration is "comparatively inferior to judicial process" in protecting individuals' statutory rights. Id. at 56.

After Gardener-Denver, the Court applied the same reasoning in permitting post-arbitration litigation of claims under the Fair Labor Standards Act (Barrentine, 450 U.S. at 742-46 (1981)), the Civil Rights Act, 28 U.S.C. § 1983 (McDonald v. City of West Branch, Michigan, 466 U.S. 284, 287-92 (1984)) and the Federal Employers' Liability Act (Atchinson, Topeka and Santa Fe Railway Co. v. Buell, 480 U.S. 557, 564-67 (1987)).

In each of those cases the Court noted that while it is permissible for the union to prospectively waive rights of its members that relate directly to the collective activity, such as the right to strike, it would "defeat the paramount purpose" of the legislation for the union to waive an individual's rights to certain equal employment opportunities and treatment. Gardener-Denver, 415 U.S. at 51. The Barrentine Court noted, "a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole." Barrentine at 742. The McDonald Court similarly stated that while an arbitrator may serve well to settle contractual disputes, he or she lacks the authority to

enforce public laws outside the confines of the contract. See McDonald, 466 U.S. at 298. The Court further noted that "the union's interests and those of the individual employee are not always identical or even compatible." Id. at 291.

In Varner v. National Super Markets, Inc., 94 F.3d 1209 (8th Cir. 1996), the Eighth Circuit Court of Appeals followed the Gardener-Denver line of cases and found within the federal courts' plenary powers under Title VII a concurrent and absolute right to bring Title VII claims in the federal forum. See id. at 1213 (citing Gardener-Denver, 415 U.S. at 36). The Court also noted that Title VII has no requirement that parties exhaust grievance and arbitral remedies before bringing federal claims. See id. While Varner dealt specifically with Title VII claims, this court believes its reasoning applies equally to the FMLA.

In the second line of cases, the Supreme Court found arbitration of statutory claims appropriate. First, in Mitsubishi, the Court held that the FAA compelled arbitration of claims under the Sherman Antitrust Act. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985). The Court acknowledged the federal policy favoring arbitration

and a broad reading of the FAA.[7] See id. at 625 (citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 (1983)). Seeing nothing in the language of the FAA to preclude arbitration of statutory claims, the Court found "no reason to depart from [the policy favoring arbitration] where a party bound by an arbitration agreement raises claims founded on statutory rights." Id. at 626. However, the Court also held that not all statutory claims are suitable for arbitration and it reiterated the two-step test for arbitrability of statutory claims enunciated in Moses H. Cone Memorial Hospital. See id. at 626-28. Under that test, a court asked to enforce an arbitration agreement purporting to reach statutory claims must first determine whether the parties in fact agreed to arbitrate that particular type of dispute. See id. at 626. So finding, a court must then look outside the agreement for any other legal constraints on arbitrability.[8] See id. at 268. Applying the

---

[7] Arbitration pursuant to CBAs has generally not been considered to be covered by the FAA, but rather by the LMRA. See Wright v. Universal Maritime Service Corp., 525 U.S. 70, 78, n.1 (1998). Nevertheless, both the LMRA and the FAA have been liberally construed to favor arbitration of most disputes. See id.; Textile Workers Union v. Lincoln Mills, 353 U.S. 448 (1957).

[8] The Court was also mindful of the general grounds that would provide for the revocation of any contract and relieve a party of the contractual duty to arbitrate. See id. at 627 (citing Southland Corp. v. Keating, 465 U.S. 1, 16, n. 11
(continued...)

second step, a court must look within the statute at issue for evidence that Congress did not intend that claims under it be subject to arbitration. See id. at 627. In deciding that case, the Court set aside much of the dicta from earlier cases that were less amenable to arbitration stating, "we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." Id. at 626-27.

While Moses H. Cone Hospital and Mitsubishi addressed the general question of arbitration of statutory claims, the Court came closer to the issue presently before this court in Gilmer, where it compelled arbitration of an ADEA claim under an arbitration agreement in a securities representative's registration application to the New York Stock Exchange. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991). Applying the two-part test from Moses H. Cone Hospital and Mitsubishi, the Court determined that the issue was within the scope of the arbitration agreement and that nothing in the ADEA evinced a congressional intent that such claims should not be arbitrated. See Gilmer, 500 U.S. at 26-7. It is significant,

---

[8](...continued)
(1984)).

however, that the Court read the representative's application as a private contract between Gilmer and his employer, clearly distinguishing it from a CBA. The Court commented on that important difference, indicating its concern about "the tension between collective representation and individual statutory rights, a concern not applicable [in Gilmer]." Id. at 35.

Finally, in Wright v. Universal Maritime Service Corp., 525 U.S. 70 (1998), the Court spoke directly to, but did not answer, the question now before this court. The Wright Court reversed a Fourth Circuit Court of Appeals ruling requiring an employee to arbitrate ADA claims against his employer pursuant to an arbitration clause in a CBA. In the decision, Justice Scalia discussed the divergence of the Gardener-Denver and Gilmer lines of cases. See id. at 76-77. The opinion acknowledged that the fundamental question remaining unsettled was the validity of any union-negotiated waiver of an employee's statutory right to a judicial forum. See id. at 77. However, the Court declined to answer that question, because it found that the employee's statutory claim was outside the scope of the arbitration clause under the first prong of Moses H. Cone Memorial Hospital and Mitsubishi test. See id. at 78-9. While the Court recognized a presumption of arbitrability under the LMRA, it also noted that the presumption is limited. See id. at 79. Specifically,

it stated that the presumption applies only insofar as the arbitrator is limited to "interpreting and applying the contract," whether the agreement says as much or not. Id. Even if the contract incorporates a given statute by reference, that merely creates "a contractual right that is coextensive with the federal statutory right [and] the ultimate question for the arbitrator would be not what the parties have agreed to, but what federal law requires; and that is not a question which should be *presumed* to be included within the arbitration requirement." Id. (emphasis in original.) The Court concluded that with the presumption in favor of arbitration so limited, it would be particularly important that any waiver of so valuable a right be clear and unmistakable. See id. at 79-80 (citing Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 707-8 (1983)). In effect, the Court heightened the showing necessary to satisfy the first prong of the Moses H. Cone Memorial Hospital test in circumstances where bargaining units purport to waive the forum rights of an individual.

Applying that heightened standard, the Wright Court determined that the terms of the contract and arbitration clause were broad, general and did not specifically incorporate the ADA--the statute at issue in that case. See id. at 80. Accordingly, the Court found no clear and unmistakable waiver of

the employee's forum right. Concluding, the Court summed up the current relationship of the two lines of decisions, stating:

> whether or not Gardener-Denver's seemingly absolute prohibition of union waiver of employees' federal forum rights survives Gilmer, Garden-Denver at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA.

Id. Thus the Court has twice acknowledged the inherent tension between the Gardner-Denver and Gilmer lines of cases[9], but in each case specifically declined to overrule Gardener-Denver and its progeny.[10] Subsequent decisions in the majority of circuits

---

[9] See Gilmer, 500 U.S. at 35; Wright, 525 U.S. 80.

[10] The Gardener-Denver Court presaged the Wright opinion, envisioning future CBAs incorporating specific statutory language, stating:

> [t]o be sure, the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII. But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of the courts, and judicial

(continued...)

reiterate that Gilmer and Wright did not reverse the Gardener-Denver line of cases and that those cases remain binding precedent.[11] See Airline Pilots Ass'n, Int'l v. Northwest Airlines, Inc., 199 F.3d 477, 481-86 (D.C. Cir. 1999) judgment reinstated, 211 F.3d 1312 (D.C. Cir. 2000); Albertson's, Inc. v. United Food & Commercial Workers Union, 157 F.3d 758, 760-62 (9th Cir. 1998); Brisentine v. Stone & Webster Eng'g Corp., 117 F.3d 519, 522-27 (11th Cir. 1997); Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1451-54 (10th Cir. 1997) vacated on other grounds, 524 U.S. 947 (1998); Pryner v. Tractor Supply Co., 109 F.3d 354, 363-65 (7th Cir. 1997); Varner v. National Super Markets, Inc., 94 F.3d 1209, 1213 (8th Cir. 1996). Thus far, only the Fourth Circuit has taken the contrary view. See Austin v. Owens-

---

[10](...continued)

> construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts.

Gardener-Denver, 415 U.S. at 57 (internal citations omitted). Thus, Gardener-Denver considered circumstances analogous to the present case, where the CBA incorporated terms "facially similar" to the statute and still found arbitration wanting.

[11] Gilmer and Wright explain that many of the justifications the Court gave in Gardener-Denver no longer hold true. See Gilmer, 500 U.S. at 33-5; see also Wright, 525 U.S. at 77 (noting the "radical change ... in the Court's receptivity to arbitration"). However, Gardener-Denver's principal rationale, that a union cannot waive an individual's statutory forum rights, remains undisturbed by the Supreme Court.

Brockway Glass Container, Inc., 78 F.3d 875 (4th Cir. 1996). In this case the Court agrees with the majority and believes itself bound to follow Gardener-Denver and Varner.

Taking the Fourth Circuit view, defendant argues that Wright opened the door to collectively bargained waivers of individual statutory forum rights. Defendant asserts that the Wright Court's refusal to compel arbitration in the absence of a clear and unmistakable waiver necessarily implies that the Court would compel arbitration where such a waiver was found. However, that proposition is not altogether certain. This court reads the Wright decision to say that the Court did not decide whether bargaining units could waive these rights, because even if a union could theoretically do so, it could not on Wright's facts. See Wright, 525 U.S. at 77, 80.

Defendant urges the court to find that the CBA in the present case does make a clear and unmistakable waiver of plaintiff's statutory forum rights. Citing Wright, Brown v. ABF Freight Sys., Inc., 183 F.3d 319, 321 (4th Cir. 1999) and Rogers v. New York Univ., 220 F.3d 73, 76 (2nd Cir. 2000), defendant argues that a test has emerged by which a court may determine whether the clear and unmistakable requirement has been met. Defendant asks the court to apply that test to the facts before it. However, because it is constrained by the precedent

established in the Gardener-Denver line of cases, the court declines to apply the Fourth and Second Circuit test.[12, 13]

---

[12] Defendant points out that one court in this district recently applied the "clear and unmistakable" language of Wright in declining to compel arbitration of Title VII and Minnesota Human Rights Act claims under a CBA. See LaCanne v. AAF McQuay, Inc., No. 00-1773(DWF/AJB), 2001 U.S. LEXIS 17801 (D. Minn. Oct. 30, 2001). That a court in this district chose to follow Wright in refusing to order arbitration where it was readily apparent that no clear and unmistakable waiver existed does not cast doubt upon our duty to follow the law enunciated in Gardener-Denver, for the same reasons the Wright Court declined to overrule Gardener-Denver. Moreover, the court is compelled to follow the reasoning set forth in this circuit in Varner. See Varner v. National Super Markets, Inc., 94 F.3d 1209 (8th Cir. 1996).

[13] The Fourth Circuit Court of Appeals described two ways by which a clear and unmistakable waiver might be found in a CBA. See Brown, 183 F.3d at 321 (citing Carson v. Giant Food, Inc., 175 F.3d 325, 331 (4th Cir. 1999)). Parties may draft an agreement in which the union explicitly agrees to submit all claims under the statute in question to arbitration, or, absent such an explicit waiver, some other provision of the agreement may make it unmistakably clear that the "statutes at issue are part of the agreement." Id. In this case, defendant argues that both are met. The broad language of Article XVI of the CBA refers to "any dispute ... between the Company and any employee concerning the effect, interpretation, application, claim, breach or violation of the terms of this Agreement." [Ptacek Aff. Ex. 1.] Article XI, section 2 of the CBA describes various components of the FMLA. [Id.] Defendant argues that the reference to the FMLA in Article XI explicitly incorporates it as a contract term subject to the arbitration clause. Further, defendant contends that the discussion of some of the employees' rights and duties under the FMLA makes it unmistakably clear that it is incorporated in the agreement such that claims raised under the Act fall within the grievance and arbitration language of Article XVI. Plaintiff responds that FMLA regulations require that when employers provide written guidance to employees regarding leave rights they must include information about the FMLA as well. 29 C.F.R. § 825.301(a)(1). By (continued...)

Therefore, because the court is not required to compel arbitration in this case, defendant's motion for partial summary judgment for lack of jurisdiction is denied.

**b. Defendant's Motion to Dismiss Plaintiff's Negligent Infliction of Emotional Distress Claim**

Defendant asserts that Count II of plaintiff's complaint, alleging negligent infliction of emotional distress, should be dismissed as a matter of law. The court agrees that plaintiff cannot maintain that cause of action in this case. Under the general rule, an independent claim of negligent infliction of emotional distress arises only where the plaintiff was within a "zone of danger" created by defendant's negligent conduct and as a result suffered "severe emotional distress with resultant physical injury." See Bohdan v. Alltool Mfg., Co., 411 N.W.2d 902, 907 (Minn. Ct. App. 1987) (citing Stadler v. Cross, 295 N.W.2d 552, 553 (Minn. 1980)). However, the Bohdan Court recognized an exception to the "zone of danger" rule for "mental anguish or suffering for a direct invasion of [an individual's] rights, such as defamation, malicious prosecution, or other willful, wanton or malicious conduct." Id. (citing State Farm

---

[13](...continued) defendant's reasoning, any CBA which contained a broad arbitration clause and informational language complying with the FMLA regulations would pass the clear and unmistakable waiver test. The court cannot agree with that proposition, either generally, or in the instant case.

Mut. Auto. Ins. Co. v. Village of Isle, 122 N.W.2d 36, 41 (Minn. 1963)). In addition to Bohdan, plaintiff relies on three other Minnesota cases and four federal court cases applying Minnesota law in his opposition to defendant's motion to dismiss the claim.[14] However, those cases are distinguishable from the matter now before the court.

First, one of those cases, Odegard v. Fenne, speaks only to intentional infliction of emotional distress, and therefore is inapplicable to the present matter. See Odegard, 500 N.W.2d at 144. Second, the majority of the remaining cases plaintiff cites relied upon defamation as the underlying cause of the emotional distress. See Bohdan, 411 N.W.2d at 905; Lee, 428 N.W.2d at 819; Schiele, 787 F. Supp. at 1545; Meleen, 740 F. Supp. at 689; Jones, Mem. Op. and Order at 3. Because defamation is specifically enumerated in Bohdan as a basis for the zone of danger exception, these cases clearly fall within its reach. See Bohdan, 411 N.W.2d at 907. Of the two remaining

[14] See Soucek v. Banham, 503 N.W.2d 153, 164 (Minn. Ct. App. 1993); Odegard v. Fenne, 500 N.W.2d 140, 144 (Minn. Ct. App. 1993); Lee v. Metropolitan Airport Com'n, 428 N.W.2d 815, 824 (Minn. Ct. App. 1988); Willner v. Godfather's Pizza, Inc., Case No. Civ.-4-94-683 [Doc. No. 21] (Report and Recommendation of Magistrate Judge Franklin L. Noel of December 12, 1994); Schiele v. Charles Vogel Mfg. Co., 787 F. Supp. 1541, 1555 (D. Minn. 1992); Meleen v. Hazeldon Foundation, 740 F. Supp. 687 (D. Minn. 1990); Jones v. Lincoln Property Co., Case No. Civ.-97-240 [Doc. No. 47] (Memorandum Opinion and Order of Judge Ann D. Montgomery of September 15, 1997).

cases, Soucek merely holds that there is no requirement that an underlying intentional tort support a claim of negligent infliction of emotional distress when a physical injury is present. See Soucek, 503 N.W.2d at 164.

Defendant argues that to the extent that negligent infliction of emotional distress exists as a stand-alone claim, it should be limited to torts to the dignity of the person and willful or wanton violations of statutes intended to protect individual dignity. Defendant contends that to allow stand-alone emotional distress claims for every alleged statutory violation would swallow up the zone of danger rule. The court agrees with defendant's analysis. Given that the exception to the zone of danger rule has only been applied in this district to defamation and discrimination cases, the court declines to extend the cause of action to claims based on alleged violations of the FMLA.

The last case plaintiff cites, Willner v. Godfather's Pizza, Inc., is the only case from this district that was not based upon an underlying defamation claim. In that case, Magistrate Judge Noel recommended that a plaintiff's negligent infliction of emotional distress claim, which was supported by an allegation of employment discrimination under the Minnesota Human Rights Act, should not be summarily dismissed for failure

to allege physical injury. See Willner, Report and Recommendation at 6 (citing State Farm Mut. Auto. Ins. Co., 122 N.W.2d at 41). However, because of the inherent subjectivity of emotional distress, the Minnesota Supreme Court continues to require "physical manifestation of the distress as proof of the genuineness and gravity of the emotional suffering." Soucek, 503 N.W.2d at 164 (quoting Garvis v. Employers Mut. Casualty Co., 497 N.W.2d 254, 257 (Minn. 1993)). The Soucek Court held that this requirement applies equally under the exception to the zone of danger rule. See id.

It remains then to determine what physical manifestations will support a claim of negligent infliction of emotional distress. While the requisite harm need not be severe, as it must in the case of intentionally inflicted emotional harm, it must at least demonstrate that a plaintiff's distress is real. See Quill v. Trans World Airlines, Inc., 361 N.W.2d 438, 433 (Minn. Ct. App. 1985). That determination depends to a large degree upon the nature and circumstances of the alleged underlying cause. See id. For example, in some zone of danger cases, the plaintiff's experience is so shocking that there can be little doubt as to the genuineness of the claimed distress. See id. (requiring only relatively mild physical symptoms to demonstrate emotional distress where plaintiff experienced a

34,000 foot free-fall in a commercial airliner); cf. Leaon v. Washington County, 397 N.W.2d 867, 875 (Minn. 1986) (holding that loss of weight and feelings of anger, fear and bitterness were insufficient to support claim of negligent infliction of emotional distress where male plaintiff was allegedly forced to participate on stage with a female stripper at a "stag party"). However, in cases applying the exception to the zone of danger requirement, where the alleged misconduct created no apprehension of death or physical injury, the veracity of the plaintiff's claim is far less certain. See Quill, 361 N.W.2d at 443. Therefore, the requisite showing of physical symptoms is higher is such cases. See id.

Here, plaintiff has offered no evidence of any physical manifestation of distress. Plaintiff's complaint simply alleges that "he has suffered emotional distress in the past and he will suffer emotional distress in the future." [Compl. at 4.] Nothing in the pleadings or supporting affidavits suggests plaintiff has experienced any demonstrable physical manifestations resulting from his claimed emotional distress, as required by Minnesota law. See Soucek, 503 N.W.2d at 164. Where a party fails to provide any evidence of a necessary element of a claim, summary judgment is appropriate. See Celotex, 477 U.S. at 322-23. Therefore, the court grants

defendant's motion for summary judgment as to Count II of the complaint.

**c. Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for summary judgment on the question of defendant's liability for alleged violations of the FMLA. Plaintiff asserts that there is no material dispute that he was entitled to FMLA leave, that defendant was aware of that fact and that defendant violated the statute and regulations when it terminated his employment.

After carefully reviewing the record, the court concludes that defendant has introduced substantial evidence on a critical fact issue. While plaintiff alleges he provided a certification of healthcare provider to defendant [Neppl Aff. at ¶ 11; Neppl Supplemental Aff. at 2], he does not identify the person to whom the document was given.[15] Conversely, defendant denies receiving the certification. [Aff's of Pflipsen, Johnson, Osberg and Ptacek.] The defendant's receipt or non-receipt of the certification is a material fact question. <u>See</u> 29 C.F.R. § 825.305(b) (requiring employees provide certification

[15] In his answer to defendant's interrogatories, plaintiff claimed he "gave the Certification to Defendant. Mr. Johnson and Ms. Osberg were shown the Certification." In his subsequent affidavits, plaintiff does not identify the recipient of the certification document.

according to the employer's procedures unless unable despite diligent good faith efforts).

Plaintiff attempts to diminish the significance of the issue by arguing that employers must give employees an opportunity to correct incomplete certifications. The applicable regulation states that "[t]he employer shall advise an employee whenever the employer finds a certification *incomplete*, and provide the employee a reasonable opportunity to cure any such defect." 29 C.F.R. § 825.305(d) (emphasis added). However, the court does not agree with plaintiff's suggestion that "incomplete" and non-existent are synonymous. An employer cannot "find a certification incomplete" if the employer cannot find it at all because the employee has not produced it. Viewing the record in the light most favorable to the non-moving party, as is required under Fed. R. Civ. P. 56, the court concludes that genuine issues of material fact exist concerning plaintiff's compliance with the certification requirements of the statute and regulations. Summary judgment is therefore inappropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## CONCLUSION

For the foregoing reasons, it is hereby ordered that:

1. Defendant's motion for partial judgment on the pleadings [Doc. No. 12] is denied in part, insofar as defendant requests the court compel arbitration and is granted in part, as to Count II of plaintiff's complaint,

2. Plaintiff's motion for partial summary judgment [Doc. No. 23] is denied.

Dated: December 10, 2002

David S. Doty, Judge
United States District Court